**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SEAN DECKER,** | ) | |
| | ) | **No. 12 CV 4040** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,[1]** | ) | |
| | ) | **September 19, 2013** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

Sean Decker seeks disability insurance benefits ("DIB"), Supplemental Security Income ("SSI"), and child's insurance benefits based on disability. After his application was denied in a final decision by the Commissioner of the Social Security Administration, Decker filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are Decker's motion for summary judgment seeking reversal of the Commissioner's decision and the Commissioner's cross-motion for summary judgment. For the following reasons, Decker's motion is granted to the extent that the matter is remanded for further proceedings and the Commissioner's motion is denied:

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of the Social Security Administration on February 14, 2013—is automatically substituted as the named defendant.

## Procedural History

Decker applied for DIB and SSI in January 2009, claiming that he became unable to work on January 15, 2007. (Administrative Record ("A.R.") 144-50.)[2] Decker also filed an application for child's insurance benefits based on disability.[3] His claims were denied initially and upon reconsideration. (Id. at 61-70, 82-89.) Decker then sought and was granted a hearing before an administrative law judge ("ALJ"). (Id. at 90-100, 105, 111.) The ALJ held a hearing on December 14, 2010, at which Decker and a vocational expert provided testimony. (Id. at 27-60.) On January 20, 2011, the ALJ issued a decision finding that Decker is not disabled within the meaning of the Social Security Act and denying his claims for DIB, SSI, and child's insurance benefits. (Id. at 9-26.) When the Appeals Council denied Decker's request for review, (id. at 1-6), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On May 23, 2012, Decker filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

In March 2005 Sean Decker suffered personal injuries when a semi-truck struck his car. (A.R. 379.) Since the car accident, Decker has suffered from back

---

[2] The ALJ's opinion states that Decker applied for benefits on September 16, 2008, but the date reflected on Decker's applications for benefits is January 27, 2009. (A.R. 12, 144, 149.)

[3] The administrative record does not include a copy of Decker's application for child's insurance benefits based on disability.

injuries, pain, and tingling and numbness in his right leg. (Id. at 34, 333, 379.) Six months after the accident, in September 2005, Decker began working as a delivery driver for a tire company. (Id. at 184.) Decker continued to work as a driver until his employment was terminated on January 15, 2007. (Id. at 43.) At his December 2010 hearing before an ALJ, Decker presented both documentary and testimonial evidence in support of his claim.

## A. Medical Evidence

Decker's medical record reaches back to March 25, 2005, the day of the car accident. (A.R. 339, 379.) On that day, an x-ray of his lumbar and cervical spines revealed a mild curvature of the thoracic-lumbar spine, bony spur formations and mild sclerosis at T-11 and T-12 suggesting a "longstanding process," and no acute fractures. (Id. at 339-40.) Two months later, an MRI of his thoracic spine confirmed mild epiphysitis and kyphosis (inflammation and excess outward curvature). (Id. at 335.)

In January 2006 Decker sought the opinion of neurosurgeon Dr. George DePhillips. (Id. at 363.) Decker told Dr. DePhillips that after nine months of chiropractic treatment, his pain was never less than a five on a scale of one to ten and often reached a seven or eight. (Id.) Dr. DePhillips ordered an MRI of his lumbar spine. (Id.) The scan showed "degeneration and diffuse protrusion of the discs at the levels of L4-5 and L5-S1." (Id. at 336.) At a follow-up visit in February 2006, Dr. DePhillips explained to Decker that spinal fusion was the only surgical option for his degenerative disc disease and recommended an epidural steroid

injection. (Id. at 362.) He advised Decker not to exceed a medium physical demand level at work, meaning occasional lifting of up to 50 pounds and frequent lifting of 20-30 pounds or less. (Id.) Later that year in October, Dr. DePhillips made similar recommendations. (Id.)

Dr. DePhillips referred Decker to Dr. Maria Estilo, a physician at a pain management center. (Id. at 243.) In summarizing a November 2006 consultation, Dr. Estilo noted that chiropractic and physical therapy had not helped Decker and that his pain was made worse by activity and was more acute at the end of the day. (Id.) She recommended a series of three lumbar epidural steroid injections to reduce pain and improve function. (Id. at 244.) Decker's straight leg-raising test and Patrick's tests were negative bilaterally in November and December 2006. (Id. at 243-44, 259-260, 294.) Decker reported that the first epidural injection relieved his pain for about a day and that the second injection provided only a slight improvement. (Id. at 278, 294.) The pain clinic did not provide the third injection because the initial two did not relieve Decker's pain. (Id. at 361.) Dr. Estilo prescribed Lorcet (hydrocodone) to supplement Decker's pain medications. (Id. at 259, 278.)

In March 2007 Decker underwent diagnostic provocation discography. (Id. at 307.) The discogram showed internal disc disruption and Grade V tears—the most severe grade—at L4-5 and L5-S1. (Id. at 308.) Dr. Gary Koehn, who performed the procedure, remarked that Decker's "verbal complaints and disc morphology match exactly." (Id.) When Dr. DePhillips reviewed these results with Decker, he advised

a two-level spinal fusion of L4-L5 and L5-S1, but also recommended a second opinion "as the patient is very young and . . . this is a big operation with significant risks." (Id. at 361.) Dr. DePhillips also noted that Decker "cannot work or function on a daily basis as his pain is intolerable." (Id.)

Dr. DePhillips referred Decker to Dr. Michael Malek for a second opinion in April 2007. (Id. at 379-80.) Based on his conversation with Decker about his back pain, which Decker said had gotten worse, and his review of Decker's 2006 MRI of the lumbar spine and the 2007 discogram, Dr. Malek recommended intradiscal electrothermic therapy ("IDET"), a minimally invasive treatment performed under local anesthetic that seeks to destroy the nerve fibers and seal the tears in the annulus. (Id.) Dr. Malek further opined that "although fusion is likely, I think that given the patient's young age I would like to try to avoid it." (Id. at 380.)

In June 2007, Decker consulted with Dr. Bruce Montella of Midwest Sports Medicine & Orthopaedic Surgery, Ltd. (Id. at 333.) Dr. Montella noted a "forward lean" to Decker's gait, which he described as antalgic (an abnormality where the stance phase is shortened relative to the swing phase). (Id.) Dr. Montella also observed limited lumbar flexion and limited extension and ongoing lumbar spasm. (Id.) Dr. Montella recommended plasma disc decompression in June 2007 and repeated that recommendation in September 2007. (Id. at 332-34.) The record does not show that Decker pursued this recommendation.

Decker continued to see Dr. DePhillips every couple of months through December 2007. (Id. at 358-61.) In August 2007, Dr. DePhillips suggested an

intraspinous process device to distract the spinous processes and decompress the posterior annulus, but Decker declined, saying that he would try to live with his pain. (Id. at 359.) At that time, Decker rated his pain as a six on a good day and a nine on a bad day. (Id.) Dr. DePhillips noted that Decker was struggling to find employment due to his pain, and in November 2007, Dr. DePhillips noted that the pain had worsened and Decker had been unable to return to work. (Id.) In December 2007 Dr. DePhillips opined that Decker is "not capable of meaningful employment." (Id.) Dr. DePhillips commented that a December 2007 MRI of the lumbar spine showed disc degeneration with a small annular tear at L4-L5. (Id. at 353, 358.) He referred Decker to Dr. Patel and Dr. Sharma for IDET as an option prior to surgery. (Id. at 358.)

In January 2008, Dr. Samil Sharma recorded Decker's complaint of nearly constant, moderate pain, which was aggravated by lifting, bending, twisting, back flexion, back extension, prolonged positions, sitting, and standing. (Id. at 384.) Decker claimed to experience some relief with rest, stretching, and medication. (Id.) On examination Dr. Sharma found limited range of motion of 30 degrees, straight leg raising testing negative, muscular strength normal, positive bilateral facet loading positive (indicating increased pain on examination of facet joints), positive bilateral Gaenslen's sign (a test used to evaluate abnormalities and inflammation of the lumbar vertebrae and sacroiliac joint), and positive bilateral Fabere test (a screening test for pathology of the hip joint or sacrum), among other examination findings. (Id. at 385.) Dr. Sharma assessed Decker as suffering from lumbar

radiculopathy, spinal osteoarthritis, and low back pain. (Id.) He prescribed Norco, Zanaflex, and Naprosyn for Decker's pain. (Id.)

In February 2008 Dr. Sharma performed a lumbar intra-articular facet injection (an injection of anti-inflammatory medication and anesthetic into the joint capsule of the facet joint) at the bilateral L4-L5 and L5-S1 vertebral levels. (Id. at 389, 391-92.) Decker reported "excellent relief of pain in the lumbar region" following the procedure. (Id. at 393.) Dr. Sharma noted that the "[p]atient was active over the test period and felt significant relief in his typical pain locations." (Id.) The following month Dr. Sharma performed radiofrequency ablation (a procedure utilizing radio frequency waves to heat the nerves surrounding the facet joints, for the purpose of interrupting the transmission of pain signals to the brain). (Id. at 398-403.) Though Decker visited Dr. Sharma in April and May 2008, the medical records do not mention whether the radiofrequency ablation mitigated Decker's pain. (Id. 404-09.) Decker returned for follow-up visits every other month from July 2008 through December 2009. (Id. at 410-22; 467-79). The records of the September 2008 through December 2009 visits are largely repetitive, with some deviation of clinical findings. The records include a continuing recommendation that Decker refrain from lifting in excess of 25 pounds. (Id.)

Decker returned to Dr. DePhillips in July 2009. (Id. at 460.) He continued to complain of low back pain with pain radiating to his right thigh with associated numbness made worse by activity. (Id.) Decker rated his pain as a seven to eight on a ten-point scale. (Id.)

The medical record includes RFC analyses from the state agency's consultants. Dr. Lenore Gonzalez authored the first RFC analysis in March 2009, and she opined that Decker was capable of the physical exertion requirements of light work: occasionally lifting 20 pounds, frequently lifting 10 pounds, sitting, standing and/or walking about six hours in an eight-hour workday, and unlimited pushing and/or pulling. (Id. at 433-40.) Dr. Richard Bilinsky issued an RFC opinion for Decker's disabled adult child benefits claim in May 2009. (Id. at 441-48.) He opined that Decker could perform light work with certain postural limitations to account for the limited range of motion, tenderness, and pain due to Decker's radiculopathy. (Id. at 443.) Specifically, he limited Decker to occasional climbing of ramps and stairs, and occasional balancing, stooping, kneeling, crouching, and crawling, and he prohibited Decker from climbing any ladders, ropes, or scaffolds. (Id.) He also indicated that Decker should avoid concentrated exposure to hazards such as machinery and heights. (Id. at 445.) Dr. Bilinsky issued a second RFC analysis in June 2009, again indicating that Decker could perform light work with the same postural limitations previously indicated, but he did not include the limitation on hazards. (Id. at 449-56.)

Dr. Anthony Francis submitted another opinion in March 2010. (Id. at 492-96.) He opined that "there is no corroborative information in [Dr. Sharma's] physical exam to justify the diagnosis of radiculopathy. The neurological exam is normal in all the repeated exams." (Id. at 495.) Dr. Francis acknowledged that Dr. Sharma's records indicated Decker's height of 70 inches and 260 pounds. (Id. at

496.)   Dr. Francis opined that Decker would be capable of light work without limitations.  (Id.)

Decker's physicians also submitted assessments of his ability to perform work-related activities.  (Id. at 499-502, 505-08.)  Dr. Sharma opined in February 2010 that Decker suffered from low back pain, lumbar radiculopathy, and spinal osteoarthritis.  (Id. at 499.)  In his view, Decker's condition has improved though he continues to require medication management.  (Id.)  Dr. Sharma indicated that Decker would experience good days and bad days, and on bad days, he would have difficulty in sustained performance of even ordinary activities of daily living and household chores and significant difficulty in traveling to work.  (Id. at 500.)  Dr. Sharma did not provide any opinion regarding Decker's ability to stand, walk, sit, carry, lift, bend, reach, or his need to lie down, noting instead that Decker needs a functional capacity analysis.  (Id. at 500-02.)

Dr. DePhillips wrote an assessment in February 2010.  (Id. at 505-08.)  He said that Decker suffered from low back pain radiating into the right thigh and opined that Decker's condition had worsened since he began treating him in January 2006.  (Id. at 505.)  Like Dr. Sharma, Dr. DePhillips opined that Decker would experience good days and bad days, and on bad days, would have difficulty in activities of daily living, household chores, and travel to work.  (Id. at 506.)  He further opined that Decker would have significant problems sustaining any type of full-time work activity.  (Id.)  He did not provide specific comments about Decker's abilities to stand, walk, sit, carry, bend, or need to lie down, writing instead that

Decker "is unable to work." (Id.) He opined that Decker is markedly limited in his ability to complete a normal workday and workweek without interruptions and in his ability to perform at a consistent pace. (Id. at 508.) In Dr. DePhillips's estimation, Decker's symptoms would also cause significant deficiencies in sustained concentration, persistence, and pace. (Id.)

## B. Decker's Hearing Testimony and Function Reports

Decker testified at the hearing that he was involved in a car accident in March 2005. (A.R. 34.) Since that accident, he has suffered from constant pain in his mid to lower back, which he described as feeling like "someone hit me with a sledgehammer and broke all the pieces but put the pieces back together, but they just don't quite fit right." (Id. at 34-35.) On a pain scale of zero to ten, with zero meaning no pain, Decker described his pain as a constant four with spikes of seven or eight. (Id. at 35.) Decker said that his pain would increase in cold temperatures, with bending or reaching, and after doing "[a]nything for an extended period of time." (Id. at 35, 47.) He relies on medication, moving around, and stretching to mitigate the pain. (Id. at 35-36.) He initially testified that he does not have any problems taking his medication but later complained that the medication makes him forgetful. (Id. at 36, 48.) The medications "slightly" dull his pain. (Id. at 48.)

Decker, a high school graduate, was 25 years old and living with his mother at the time of the hearing. (Id. at 32.) He is 5'10" tall and weighed 225 pounds at the time of the hearing, down from the 260 pounds he weighed when he applied for benefits. (Id.) He can bathe and dress himself. (Id. at 37.) He helps out at home by

sweeping and vacuuming about once a week. (Id.) He straightens up his room but cannot make his own bed because he cannot reach across it. (Id. at 38.) He makes simple meals, like spaghetti and marinara sauce, and he shops for groceries about once every two weeks. (Id.) He drives his mother's car once or twice a week for trips around town, meaning within five miles of his home, when he needs to pick up dinner from a fast food restaurant, or to buy gas or personal items. (Id. at 38-39.) Decker spends his days watching television and movies, playing video games, and talking with his mother. (Id. at 39-41.) He sleeps about five to seven hours a night and wakes up once or twice a night. (Id. at 49.)

The ALJ asked Decker why he had not pursued the thermal treatment recommended by his doctors. (Id. at 36.) Decker explained that he thought he had completed it because he underwent a procedure involving the burning of nerves, suggesting that he did not understand that his doctors had recommended two types of thermal procedures. (Id.) Decker also explained that he was no longer under the care of Dr. Sharma, the pain specialist, but was obtaining his prescriptions from Dr. Nemeth, a primary care doctor who has cared for him for his whole life. (Id. at 41-42.)

The ALJ asked Decker to describe his limitations. (Id. at 41.) Decker said that he could walk about two or three city blocks and lift about 10 to 15 pounds. (Id.) Decker explained that he could sit for about 15 to 30 minutes, or stand for a similar period of time, but afterwards would "get really uncomfortable and have to move around a lot," or need to shift or fidget. (Id. at 41, 50.) Decker testified that

he must switch positions after about 15 to 30 minutes, meaning that "if I'm sitting I have to stand, if I'm standing I got to sit, if I'm walking I need to [lie down]." (Id. at 51.) While testifying, he asked for permission to stand. (Id. at 41.) About once a week, the right side of his thigh goes numb for at least half an hour, and then he does not move until the numbness abates. (Id. at 45-46.) In a function report, he indicated that lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing aggravate his back pain. (Id. at 223.)

Decker testified that he worked full-time as a delivery driver until January 2007. (Id. at 42-43.) He lost his job because state regulations prohibited delivery drivers from taking the medications that Decker was taking for his pain. (Id. at 43.) Decker said the job required him to roll tires onto a lift and it caused him constant pain. (Id. at 43-44.) The heaviest weight he lifted at work was 50 pounds, and he frequently lifted 35 pounds. (Id. at 178.) He would carry the tires for about three feet and then roll them. (Id. at 185.) He missed work once or twice a month because of his back pain. (Id. at 44.) If he had a particularly busy day at work, the next day his pain would be worse, and he would have to miss work. (Id. at 45.) To describe how his pain interferes with his concentration or focus, Decker said that sometimes he has to pause his video games or movies so that he can stretch or move around. (Id. at 46-47.)

## C.    Vocational Expert's Testimony

Lee Knutson, a vocational expert ("VE"), classified Decker's past work as a "delivery driver for tires." (A.R. 52.) This position is a medium, semi-skilled job, he

explained, but Decker's performance may have been at the heavy exertion level because Decker may have moved tires weighing 45 to 50 pounds. (Id.) The ALJ asked the VE three hypothetical questions to assess the types of jobs available to individuals with various limitations. (Id. at 53-56.) The first hypothetical concerned an individual of Decker's age, education, work experience and skills, who was limited to lifting and/or carrying 20 pounds occasionally, 10 pounds frequently, and/or standing or walking six hours in an eight-hour day, and/or sitting six hours in an eight-hour day with normal breaks, but who was restricted to only occasional climbing, balancing, stooping, crouching, and kneeling, and was restricted from climbing and concentrated use of moving machinery. (Id. at 53.) The VE replied that this individual could not perform Decker's past work as a driver, but could work as an assembler, hand packer, or cashier. (Id. at 53-54.)

In his second hypothetical the ALJ added one modification to the individual's restrictions: the individual must be able to alternate positions every 30 minutes at will between sitting and standing, provided that the individual would not be off task more than 10 percent of the work period. (Id. at 54.) The VE replied that this hypothetical individual would be limited to sedentary jobs such as inspector, film touch-up inspector, spotter, table worker, checker, weigher, or order clerk. (Id. at 55-56.) The VE also mentioned that about five percent of cashier jobs would allow the sit or stand option. (Id. at 55.)

In his final hypothetical the VE was to assume a person with impairments causing pain that would preclude him from working on a regular and continuing

basis for eight hours a day, five days a week, for a 40-hour work week. (Id. at 56.) The VE testified that this individual would not be able to sustain a full-time job. (Id.) Responding to questions from Decker's attorney, the VE also added that an employee who regularly missed two or more days a month would not be able to maintain employment. (Id. at 57.)

## D.    The ALJ's Decision

The ALJ was of the opinion that Decker filed for benefits because he could not find work, not because he was physically unable to work. (A.R. 17.) He concluded that Decker is not disabled under sections 223(d) and 1614(a)(3)(A) of the Social Security Act. (Id. at 12.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires him to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the residual functional capacity ("RFC") to determine at steps four and five whether

the claimant can return to his past work or to different available work.  *Id.* § 404.1520(f), (g).

The ALJ found that Decker had not attained age 22 as of January 15, 2007, the alleged onset date, and thus met the age requirement for eligibility for child's insurance benefits.  (A.R. 12, 14.)  The ALJ also noted that Decker met the insured status requirements through September 30, 2011.  (Id. at 14.)  At step one, the ALJ found that Decker had not engaged in substantial gainful activity since the onset date.  (Id.)  At step two, the ALJ concluded that Decker suffers the following severe impairments: degenerative disc disease of the lumbar spine, epiphysitis and kyphosis of the thoracic spine, and obesity.  (Id.)  At step three, the ALJ found that Decker's impairments or combination of impairments did not meet or medically equal a listed impairment.  (Id. at 15.)  Before reaching step four, the ALJ assessed that Decker has the RFC to perform light work, "except he must be able to change positions between sitting and standing at will every thirty minutes, but will not be off task for more than 10% of the workday due to these changes of position[,]" is limited to only occasional balancing, stooping, kneeling, crawling, crouching, and climbing ramps or stairs, and is restricted from concentrated exposure to hazards such as using moving machinery and unprotected heights and from climbing ladders, ropes or scaffolds.  (Id.)  At steps four and five, the ALJ concluded that Decker is unable to perform his past relevant work but could perform a significant number of jobs in the national economy, such as inspector, checker, weigher, film touch-up inspector, cashier, cashier II, and order clerk.  (Id. at 20-21.)

## Analysis

Decker argues that the court should reverse the ALJ's decision because of errors in the treating physician and functional capacity analyses and in the credibility assessment. The court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, the court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

### A.      Treating Physicians' Opinions

Decker faults the ALJ for giving little weight to the opinions of Dr. DePhillips, Decker's treating neurosurgeon, and Dr. Sharma, Decker's treating pain specialist. "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v.*

*Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).[4] However, an ALJ "may discount a treating physician's medical opinion [if] the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (internal quotations omitted). If the ALJ declines to accord controlling weight to a treating source opinion, he must offer "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

The ALJ offered three reasons for discounting Dr. DePhillips's opinion. First, the ALJ noted that his opinion is not supported by the clinical findings of other physicians. (A.R. 19.) Second, the ALJ criticized his opinions for relying largely on Decker's subjective complaints rather than on clinical observations. (Id.) Third, the ALJ was troubled that he "offered differing opinions of the claimant's capacity which do not correlate with any change in diagnostic or clinical findings." (Id.) Here, the ALJ contrasted Dr. DePhillips's February 2006 treatment note that Decker could remain working at a "medium physical demand level with occasional lifting of up to 50 pounds," with an April 2007 treatment note that "patient is totally disabled and cannot work or function on a daily basis as his pain is intolerable." (Id.)

---

[4] The Commissioner amended this regulation by removing paragraph (c) and re-designating paragraphs (d) though (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656-57 (2012).

Decker argues that Dr. DePhillips revised his opinion in response to the 2007 discogram. (Id. at 307-09.) He claims that it was not until Dr. DePhillips reviewed the results of the discogram that he recommended spinal fusion or concluded that Decker's pain precluded working. (Id. at 361.) The record supports Decker's view. While Dr. DePhillips opined in February 2006 that fusion was the only surgical option, he did not actively recommend the procedure or refer Decker to another specialist for a second opinion about fusion until the lumbar discography provoked concordant pain at the L4-L5 and L5-S1 levels. (Id.) The second doctor also cited the discogram as one basis for his opinion that Decker was a candidate for spinal fusion (though his young age was a contraindication). (Id. at 380.)

The ALJ's opinion does not mention the discogram results, even as he twice criticizes Dr. DePhillips for altering his views without any new diagnostic evidence to justify the change. (Id. at 19.) Perhaps had the ALJ considered that Dr. DePhillips found the discogram findings significant, he would have credited Dr. DePhillips's revised view of Decker's pain. But because the ALJ did not mention the discogram, this court does not know whether the ALJ considered it. The court "cannot uphold an administrative decision that fails to mention highly pertinent evidence." *Parker v. Astrue,* 597 F.3d 920, 921 (7th Cir. 2010).

The Commissioner tries to rehabilitate the ALJ's opinion by arguing that Dr. DePhillips had no basis to modify his opinion of Decker's pain other than Decker's escalating complaints, but again, this argument ignores the March 2007 discogram. Without discussing the discogram findings, the Commissioner argues

that there was no new diagnostic evidence between November 2006, when an MRI showed degenerative disc disease at the L4-5 and L5-S1 levels, and April 2007, when a CT scan confirmed annular tears at L4-5 and L5-S1. The Commissioner seems to be equating the results of the two tests, even as the MRI found only "degeneration and diffuse protrusion of the discs" (and one tear, as interpreted by Dr. DePhillips), whereas Dr. DePhillips interpreted the CT scan as showing two annular tears, which the discogram confirmed as Grade V. (Id. at 307-08, 331, 361.) The Commissioner's argument must fail because it ignores relevant medical evidence. "An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence.'" *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (quoting *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000)).

The court agrees with the Commissioner that Dr. DePhillips's opinion that Decker is "unable to work" is not a medical opinion, but an opinion on an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.127(d)(1), 416.927(d)(1). But Dr. DePhillips also rendered medical opinions about the severity of Decker's symptoms, the worsening of his condition over time, and the limitations caused by his pain. (A.R. 505-08.) The ALJ should have considered the factors listed in 20 C.F.R. §§ 404.1527(c), 416.927(c), to determine the appropriate weight owed to those opinions. "An ALJ must consider the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson*,

615 F.3d at 751; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). In this case, many of the factors favor Dr. DePhillips: his specialty as a spine surgeon is relevant; he treated Decker on a regular basis over a four-year period before rendering an opinion; he ordered multiple tests that revealed annular tears and degenerative disc disease; and he recommended treatment consistent with his diagnosis. On remand, the ALJ might find, as he did initially, that the "clinical findings of other physicians" do not support Dr. Phillips's view. (A.R. 19.) But before discounting Dr. DePhillips's opinion, the ALJ must consider all of the factors listed in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.1527(c), and not just those that diminish his opinion.

Decker also challenges the ALJ's evaluation of Dr. Sharma's opinion. The ALJ offered two explanations for his decision to assign "light weight" to Dr. Sharma's opinion: (1) he characterized the opinion as "based exclusively on the claimant's subjective reports of pain," and (2) he found Dr. Sharma's treatment notes to be inconsistent with the diagnosis of radiculopathy. (A.R. 19.) Regarding the first point, Decker argues that Dr. Sharma's treatment notes contain many objective findings that the ALJ overlooked. The court agrees, even as it acknowledges that Dr. Francis had some basis for characterizing Dr. Sharma's file as a "boilerplate exam repeated over and over." (Id. at 495.) But buried in the repetitive nature of Dr. Sharma's notes are some objective examination findings that varied over time. For example, Dr. Sharma observed positive bilateral Gaenslen's sign and positive bilateral Fabere test in January, February, March,

April, May, and July 2008, but negative bilateral Gaenslen's sign and negative bilateral Fabere test on examination in November 2008 and in January and March of 2009. (Id. at 385, 387, 390, 394, 397, 401, 405, 408, 411, 417-18, 420, 423.) Dr. Sharma's treatment notes from November 2008 and January and March 2009 include an assessment of pain response upon axial loading and simulated axial rotation that appear to be unique. (Id. at 418, 421, 423.) Thus, the ALJ's conclusion that Dr. Sharma's records are "exclusively" based on Decker's subjective complaints cannot be accepted because it is at odds with the existence of some objective clinical findings in the medical record. Moreover, the court questions the basis for the ALJ's rejection of Dr. Sharma's partial diagnosis of lumbar radiculopathy because he accepted the diagnosis of lumbar radiculopathy offered by Dr. Bilinsky. (Id. at 20, 449-56.)

The Commissioner argues that even if the ALJ had fully credited Dr. Sharma's opinion, it would not necessarily conflict with the ALJ's RFC finding. While it is true that Dr. Sharma did not issue any specific assessments of Decker's physical capabilities, the pain specialist did opine that on Decker's bad days, he would have difficulty sustaining ordinary activities of daily living, household chores, and traveling to work. (Id. at 500-02.) Dr. Sharma's opinion thus is in some tension with the ALJ's finding that Decker is capable of modified light work. On remand, the ALJ should reassess whether Dr. Sharma's opinion is entitled to controlling weight, and if not, should consider the regulatory factors listed in 20 C.F.R. §§ 404.1527(c), 416.1527(c) to determine what if any weight is due.

## B.   Credibility Analysis

Decker argues that the ALJ improperly evaluated his credibility after assessing his RFC and failed to build a logical bridge between the evidence and his conclusion that Decker overstated the limiting effects of his symptoms.  An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to see and hear the witness.  *Eichstadt v. Astrue,* 534 F.3d 663, 667–68 (7th Cir. 2008).  But it is "possible to upset a credibility finding if, after examining the ALJ's reasons for discrediting testimony, we conclude that the finding is patently wrong." *Larson,* 615 F.3d at 751.  That means that the court will not disturb the ALJ's credibility determination unless it is "unreasonable or unsupported." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Decker criticizes the ALJ's use of the following standard template:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(A.R. 16.)  As Decker argues, this language has been criticized by the Seventh Circuit as getting "things backwards," because an ALJ is required to make an independent credibility determination before assessing the claimant's ability to work. *See Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012).  This template suggests that the ALJ disregarded the claimant's testimony because it did not conform to his preconceived view of the RFC. *See id.*  But the Seventh Circuit also has made it clear that an ALJ's use of this template does not amount to reversible

error if he "otherwise points to information that justifies his credibility determination." *See Pepper,* 712 F.3d at 367-68. In other words, there is no need to reverse based on an ALJ's use of this template where he gave other reasons, grounded in evidence, to explain his credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

The ALJ articulated reasons for his credibility finding immediately following the template and throughout the RFC analysis. In accordance with SSR 96-7p the ALJ considered alongside Decker's statements factors such as his daily activities, treatment, medications, work history, and the objective medical evidence. Decker challenges the validity of many of the ALJ's conclusions about those factors. His most persuasive argument challenges the ALJ's adverse inference arising from Decker's work history. Taken together, Decker's lack of consistent employment prior to the accident, his work for one and a half years following the accident, and the absence of a nexus between Decker's injury and the end of his employment, caused the ALJ to question whether Decker's medical condition was the cause of his current unemployment.

The court finds Decker's challenges to this adverse inference compelling. The Commissioner's regulations instruct that a claimant's "prior work record and efforts to work" are relevant in the assessment of an individual's statements about pain, symptoms, and effect the symptoms have on his ability to function. SSR 96-7p, 1996 WL 374186, at *5. But the ALJ's assumption that Decker could have developed a sustained work history before his accident seems to overlook that he

was merely 20 years old at the time of his injury and therefore had not enjoyed a full opportunity to develop a sustained work record.  But even at 20 years old, Decker had held a series of jobs as a driver, cook, stocker, and in a security function from May 2001—when he was 16 years old—through January 2007.  (A.R. 184.) Some of these positions were short-lived and others occupied him for nearly a year. (Id.)  Considering Decker's truncated opportunity to work before his injury, the ALJ's conclusion that his limited employment history is indicative of a compromised work ethic is an unsupported leap.

The ALJ's analysis of Decker's work history following his accident is troublesome because it is incomplete. Decker testified that the job caused "pretty much constant pain," that busy days aggravated his pain, and that he had to skip work once or twice a month due to severe pain.  (Id. at 43-44.)  The ALJ did not address these claims even as he relied on Decker's experience as a delivery driver as evidence of Decker's ability to work.  The "fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003).  Perhaps the ALJ disbelieved Decker's testimony that he was in constant pain at work and was incapacitated by pain once or twice a month, but the ALJ should have acknowledged these claims before concluding that Decker's work as a delivery driver belied his claim of disability. Additionally, the ALJ's conclusion that Decker stopped working for reasons other than the limitations caused by his injuries is at odds with the evidence.  Decker

testified that his employer terminated him because regulations prohibited him from performing his job while taking the medications prescribed to manage the pain from his injury. (A.R. 43.) The ALJ's finding that there was no nexus between Decker's injury and the end of his work is therefore not supported.

The only other persuasive challenge to the ALJ's credibility analysis relates to his opinion about Decker's decision not to pursue certain treatments. SSA regulations state that "the individual's statements may be less credible if . . . records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p, 1996 WL 374186, at *5. But the regulations further elaborate that "appropriate development must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed." SSR 82-59, 1982 WL 31384, at *2. The ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue . . . treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7. Good reasons may include "an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

In this case, the ALJ's opinion does not explain whether the ALJ considered why Decker had avoided certain treatment modalities. The ALJ explained that Decker's comment to Dr. DePhillips that he would "continue living with his pain"

rather than try an intraspinous device cast doubt on his claimed intensity of pain, but the ALJ did not ask Decker why he preferred the status quo to the treatment. The ALJ did not ask Decker why he did not follow through with bi-accuplasty, either. The ALJ questioned Decker about his failure to obtain IDET, though the opinion does not reveal whether the ALJ found his explanation credible. (A.R. 36.) The medical record shows that Decker tried to obtain relief through radio frequency ablation, lumbar facet injections, and chiropractic treatment, so perhaps Decker had considered the other treatment options. Before discrediting Decker for rejecting some of the recommended treatment avenues, the ALJ should have elicited Decker's reasons for his decisions. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

## C.    The RFC Determination

Decker also raises three challenges to the ALJ's finding that he is capable of performing light work with certain postural limitations. First, Decker argues that the ALJ did not identify medical evidence to substantiate his opinion of Decker's functional capacity. Second, he challenges the ALJ's finding that Decker is capable of occasional stooping. And third, he argues that the ALJ did not adequately address the impact of his obesity on his ability to perform light work.

Social Security Ruling 96-8p states that the RFC assessment is a "function-by-function" evaluation based on all of the relevant evidence of the claimant's ability to do work-related activities. SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996). "In determining an individual's RFC, the ALJ must evaluate all limitations

that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7.

Decker first argues that the ALJ's RFC determination "lacks a requisite record basis" because it does not explain the basis of the functional capacity finding. The ALJ's analysis is somewhat diffuse, but it includes the following: a lengthy discussion of Decker's testimony, which the ALJ found only partially credible; the reports of Decker's treating physicians, which the ALJ also found questionable; the clinical signs and diagnostic tests in Decker's medical file; Decker's medication regimen; and the multiple RFC analyses provided by the state agency's consulting physicians. (A.R. 15-20.) The ALJ described Decker's testimony about his pain and his difficulty in maintaining prolonged sitting and standing. (Id. at 16.) He also listed the specific functional limitations that Decker had reported in writing to the state agency. (Id.) The ALJ also noted Decker's height, his various decreasing weights over time, and his obesity. (Id. at 18.)

Decker takes specific issue with the ALJ's finding that he is capable of maintaining a seated or standing position for a 30-minute period. This argument is not so much a challenge to the RFC analysis but to the credibility analysis, as the only evidence that Decker submitted on this point was his testimony. It was

Decker's burden to produce evidence of his impairments. *See Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); 20 C.F.R. § 404.1545(a)(3). Yet neither of Decker's treating physicians contributed an opinion on this issue. The reports of Drs. Bilinsky and Francis did not support Decker's claim either—and though they recommended some postural limitations to standard light duty work, an accommodation to allow Decker to shift positions was not among them. The ALJ's determination that Decker needs to be permitted to change positions every half-hour shows that the ALJ resolved the conflict between the testimony and medical evidence largely in Decker's favor.

Decker separately challenges the ALJ's consideration of his ability to stoop on an occasional basis. Decker's primary concern here is that the ALJ did not mention a note in Dr. Sharma's file indicating Decker's limited flexion of 30 degrees. (See A.R. 62.) Perhaps the ALJ failed to mention this salient evidence because he had assigned Dr. Sharma's opinion only little weight. Selective consideration of medical reports can be a basis for remand, *see Myles*, 582 F.3d 672 at 677, and the court shares Decker's concern that the ALJ did not mention Dr. Sharma's objective finding of limited range of motion when formulating the RFC. But the doctrine of harmless error is applicable to RFC analyses. *See Pepper*, 712 F.3d at 364. It applies in this case because Dr. Sharma's limited range of motion finding was one basis for the postural limitations that the ALJ ultimately adopted. Dr. Gonzalez's report referenced Dr. Sharma's finding, and when Dr. Bilinsky reviewed that report, he opined that Decker's limited range of motion compelled the inclusion of

postural limitations, including a limitation on stooping. (A.R. 440, 450.) Because Dr. Sharma's range of motion finding was incorporated into the RFC, any error on this point is harmless.

Finally, Decker faults the ALJ for not adequately considering the impact of his obesity when determining his RFC. Social Security Ruling 02-1p instructs that an ALJ's RFC assessment must include an evaluation of whether the "combined effects of obesity with other impairments" is "greater than might be expected without the obesity." SSR 02-1p, 2000 WL 628049, at *6 (Sept. 12, 2002). In this case, the ALJ focused his attention on Decker's obesity as a part of the RFC analysis. The ALJ recognized that Decker remained obese despite his weight loss. He also considered that none of Decker's treating physicians had recommended that he reduce his body mass through diet or exercise. (A.R. 18.) Decker suggests that the ALJ read too much into his doctors' apparent disinterest in his obesity. But the ALJ explained that the absence of medical attention to his obesity by his treating physicians was important because it showed that there "is no medical evidence that the claimant's obesity imposes any mobility or functional limitations beyond those set forth above and incorporated into the [RFC] assessed herein." (Id.) In other words, Decker's physicians did not "specify how his obesity further impaired his ability to work." *Skarbek*, 390 F.3d at 504. Nor did Decker, yet it was his burden to produce evidence of his impairments. *See Punzio,* 630 F.3d at 712. The ALJ's conclusion that Decker's obesity did not impose additional functional limitations is supported by substantial evidence.

The court notes one minor error in the RFC analysis that may be nothing more than a typographical one, but it should be reviewed on remand. The ALJ adopted Dr. Bilinsky's RFC finding of light work with certain postural and hazards restrictions, (see A.R. at 15, 20, 445), and added a final restriction, an option to change positions between sitting and standing every 30 minutes at will, provided Decker would not be off task more than 10 percent of the workday (id. at 15). The ALJ further noted that the VE had testified that with these restrictions, Decker would be capable of modified light work. (Id. at 21.) To the contrary, the VE testified that the addition of the sit/stand option would necessitate a sedentary job. (Id. at 55.) The ALJ's error appears to be harmless because the ALJ cited the occupations of inspector, checker, weigher, cashier, order clerk, film touch up inspector, and cashier II as positions that are within Decker's capacity for modified light work, and these were the same positions that the VE provided as examples of the sedentary work that Decker could be expected to perform. (Id. at 21, 55) Thus, the error is not a substantive one.

## Conclusion

For the foregoing reasons, Decker's motion for summary judgment is granted to the extent that this matter is remanded for further proceedings, and the Commissioner's cross-motion is denied.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**